ESTATE OF PHILBRICK: NEIS, Appellant, v. DITHMAR, Personal Representative, and others, Respondents.

*No. 481. Submitted under sec. (Rule) 251.54 May 8, 1975.—Decided June 3, 1975.*
(Also reported in 229 N. W. 2d 573.)

For the appellant the cause was submitted on the brief of *A. William Johnson* of Baraboo.

For the respondent John Dithmar there was a brief by *Greenhalgh, Jenks & Dithmar* of Baraboo; for the respondent Mattie Lou Roeder there was a brief by *K. S. Stevens, S. C.,* of Reedsburg; and there was a brief by respondent guardian *ad litem Forrest Hartmann* of Baraboo.

WILKIE, C. J.  Several issues are presented on this appeal from a judgment making final settlement of the Orriel F. Philbrick estate. Orriel F. Philbrick died testate on July 6, 1972. John Dithmar was the duly constituted personal representative, and one of the two daughters of the deceased, Mary Louise Neis, objected to several items in the final account as filed by Mr. Dithmar. Following a hearing on these objections, the objections were found without merit and judgment ap-

proving all accounts filed by the personal representative was entered. Mrs. Neis appeals from this judgment. We affirm.

Mrs. Neis's first objection is that the testator's house contained more cash than was set forth in the inventory. We affirm the trial court's determination approving the cash as reported by Mr. Dithmar in the sum of $677.

The day after their father's death Mrs. Neis and her sister, Mrs. Roeder, saw some cash in a filing cabinet in the testator's home. Mrs. Roeder then called the personal representative off the golf course to come and count the money. Mr. Dithmar did come and count the money, and the inventory shows the total as $677. Mrs. Neis claims there actually was more money than this when she first looked in the drawer, and claims the personal representative breached his fiduciary duties in failing to account for all the money.

The trial court's finding that there was no evidence of wrongdoing is amply supported by the record. While both Mrs. Roeder and Mrs. Neis reported seeing some $100 bills in the drawer, neither said how many such bills she saw. Moreover, Mrs. Roeder does not claim that the $677 figure is inaccurate. Mrs. Neis said she saw two packets of money and "quite a few" hundred dollar bills. She also said she and her sister saw a piece of paper in the drawer with 17,600 written on it. There is no testimony where in the drawer the slip of paper was found, however, and Mrs. Roeder denied she saw it. The crucial fact is that neither woman counted the money. For his part, Mr. Dithmar said that $677 was all he found and that he did not remember if that amount included any hundred dollar bills.

This evidence is simply insufficient to show a breach of duty by Mr. Dithmar by failing to account for all the cash. That the cash included some hundred dollar bills does not establish that more than $677 was present. Further, it is mere speculation that the slip of paper

containing the figure 17,600 indicates that that amount of money was in the drawer. For all that appears from the record, the slip of paper may have been completely unrelated.

Mrs. Neis also claims that the trial court was in error in approving the designation of a savings certificate as joint property in the names of the testator and his other daughter, Mattie Lou Roeder. We affirm the trial court's determination that the savings certificate was joint property, rather than being a part of the estate proper.

On December 31, 1971, the testator opened a joint account (the savings certificate) with his daughter Mattie Lou Roeder, payable on death to the survivor. Mrs. Neis contends the account was not really joint and should have been a part of the testator's estate. The trial court rejected this contention and ruled the account in fact joint with Mrs. Roeder therefore entitled to the proceeds. The court's ruling was correct.

As the court said in *Estate of Pfeifer*,[1] concerning survivorship rights in joint savings accounts:

"Although the form of the account is not conclusive, . . . an account opened in joint names raises a rebuttable presumption that the creator of such an account intended the usual rights incident to jointly owned property, such as rights of survivorship, to attach to it. Evidence showing a different intent, for instance that the joint names were adopted for convenience without the intent of conferring ownership, may serve to prove agency or trusteeship in the third party in respect to the account but in the absence of such evidence, which must be clear and satisfactory, the presumption that the depositor intended the usual incidents of jointly held property when he opened a joint account is sufficient to support a finding to that effect."

[1] (1957), 1 Wis. 2d 609, 612, 613, 85 N. W. 2d 370. *Accord: Estate of Kohn* (1969), 43 Wis. 2d 520, 524, 525, 168 N. W. 2d 812; *Estate of Gray* (1965), 27 Wis. 2d 204, 208, 209, 133 N. W. 2d 816.

The evidence relied upon by Mrs. Neis to rebut the presumption consists of testimony by Mrs. Roeder that she used the testator's checkbook as agent to assist him in paying his bills. However, this testimony relates solely to the testator's checking account, and not to the joint savings account, which consisted of a savings certificate. Thus we conclude that the testimony relied upon by Mrs. Neis falls short of the clear and satisfactory evidence necessary to rebut the presumption of joint ownership.

Mrs. Neis also argues here, for the first time, that when the testator set up the joint account, approximately six months before his death, he lacked the necessary mental capacity. Although this objection can not now be raised as a matter of right on appeal, it is clear that the record here contains insufficient evidence to support Mrs. Neis's contention. Although there is testimony that the testator failed perceptibly in the last five or six months of his life, there is no testimony indicating that in December, 1971, when the joint account was created, there was any lack of mental capacity on the part of the testator.

Mrs. Neis claims that the personal representative breached his fiduciary duty in the manner in which he sold the testator's home. We think not. Although the testator's will authorized his personal representative to sell any real estate in his estate with or without notice, or without any court order, actually Mr. Dithmar did seek court approval for the sale of testator's residence. As the record shows, on March 20, 1973, in the trial court's chambers, Mr. Dithmar and the testator's two daughters agreed that the house would be publicly advertised and sealed bids solicited with the highest bidder to be the purchaser, subject to court approval. The house was then advertised and publicly shown on a Sunday afternoon in March. Twenty to thirty people viewed

the premises and two submitted bids. Mrs. Neis bid $23,251—one dollar over the appraised value of $23,250—and Mr. and Mrs. Derlan Kuhnau bid $23,300. The bids were opened at 1 p.m. on March 27, 1973, and on March 29th the trial court ordered Mr. Dithmar to accept the Kuhnaus' bid and deliver possession of the house on May 1st, upon payment of the purchase price.

Mrs. Neis raises two objections.

First, she argues that because of her status as a beneficiary of the estate, after the sealed bids were opened she should have been granted the opportunity to submit another bid, topping the Kuhnaus' bid. She cites no authority recognizing such a right, and to allow such a procedure would not only be unfair to the high bidders in this case, but also would discourage outsiders from ever bidding in sealed bid sales of any testator's property in the future.

Second, Mrs. Neis points out correctly that the Kuhnaus were occasional clients of Mr. Dithmar and that he did not inform the trial court of that fact before the sale was approved.[2] Mrs. Neis argues these facts show Mr. Dithmar breached his fiduciary duties. We disagree. Mrs. Neis heavily relies upon *Estate of Scheibe*,[3] where the court held that in selling a decedent's property under a testamentary general power of sale the executor owes a fiduciary duty to the beneficiaries of the estate. The court said in part:

". . . an executor with an unqualified power of sale must exercise the diligence and caution which a careful and prudent owner would observe in the sale of his own property.

---

[2] Mrs. Neis also asserts that Mrs. Kuhnau is a cousin of Mr. Dithmar's wife. Although this matter is mentioned in the record, Mr. Dithmar never directly acknowledged the existence of this relationship.

[3] (1966), 30 Wis. 2d 116, 140 N. W. 2d 196.

"The duty of loyalty requires that the executor not be motivated in his actions by self-interest or the interest of third parties."[4]

In *Scheibe* the court held the executor breached this duty where he sold property to his sister in a private sale for less than half its apparent fair-market value. The court said in part:

"The respondent in 1963 at no time offered the property for sale to the public, he engaged no real-estate broker, did not advertise the property for sale either in the newspapers or by putting a sign in front of the property."[5]

The instant case is quite different. Not only did Mr. Dithmar publicly advertise the sale, netting 20–30 interested viewers of the house, but he did so under a procedure authorized by the court and agreed to by the estate's beneficiaries, to whom he owed his duty of loyalty. Although the house was sold to a couple who had been his clients, the record is devoid of any evidence showing that Dithmar was partial toward them. The sealed bid arrangement indicates to the contrary. Although it would undoubtedly have been better practice for Dithmar to have revealed his past relationship with the Kuhnaus to the trial court before approval of the sale, his failure to do so, under the circumstances of this case, yields no inference of impropriety.

Finally, Mrs. Neis points out that Judge HILL and Mr. Dithmar were law partners until the early 1960's when Hill went on to the bench. Here, too, however, there is no evidence of partiality or impropriety of the trial court, and Mrs. Neis has not suggested that the trial court violated the Code of Judicial Ethics.[6]

---

[4] *Id.* at pages 120, 121.

[5] *Id.* at page 121. *See also: State v. Hartman* (1972), 54 Wis. 2d 47, 55, 194 N. W. 2d 653.

[6] (1967), 36 Wis. 2d 252, 256, 153 N. W. 2d 873, 155 N. W. 2d 565. Rule 1, at page 259, provides for automatic disqualification

▇▇▇▇▇▇▇

Mrs. Neis also contends that, as a matter of law, Dithmar was not entitled to both an attorney's fee and a fee as personal representative. It is clear that under sec. 857.05 (3), Stats., which was effective April 1, 1971, the court had the discretion to allow both fees. That section provides as follows:

"(3) ATTORNEY'S FEES AND COMMISSIONS. If the personal representative or any law firm with which the personal representative is associated also serves as attorney for the decedent's estate, the probate court may allow him either executor's commissions, (including sums for any extraordinary services as set forth above) or attorney's fees. The court may allow both executor's commissions and attorney's fees, and shall allow both if the will of the decedent authorizes the payments to be made."

Mrs. Neis does not contest the reasonableness of the amount of these fees, but rather argues that as a matter of law Dithmar was not entitled to a dual fee. It is clear that under the statute the judge was free to allow the dual fee in his discretion.

Although Mrs. Neis asked for a discretionary reversal under sec. 251.09, Stats., we see nothing to indicate that a miscarriage of justice has occurred, and we therefore see no basis whatsoever for ordering a new trial in the interest of justice.

*By the Court.*—Judgment affirmed.

---

where a judge's close relatives or significant financial interests are involved in any matter. The Comment to Rule 1 recommends voluntary disqualification in "lesser situations," according to the "judge's own sense of propriety."